UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KEITH DREW,                                    :

            Plaintiff,                         :          16 Civ. 0594 (AJP)

        -against-                              :          **OPINION & ORDER**

CITY OF NEW YORK, et al.,                      :

            Defendants.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

            Plaintiff Keith Drew, an inmate formerly in the custody of the New York City

Department of Correction ("DOC"), brings this pro se § 1983 action, alleging violations of his

constitutional rights due to his alleged assault by various DOC employees and the destruction of his

personal property.  Presently before the Court is defendants' summary judgment motion (Dkt. No.

27), asserting that Drew did not exhaust his administrative remedies and that his claims against

defendants Deputy Warden Fadina, Warden Augustus, and the City fail as a matter of law (see

generally Dkt. No. 28: Def. Br.).  Drew did not respond to the motion, and the time to do so has long

passed.  The parties have consented to decision of this case by a Magistrate Judge pursuant to 28

U.S.C. § 636(c).  (Dkt. No. 17.)

            For the reasons set forth below, defendants' motion for summary judgment is

DENIED as to Drew's excessive force claim against defendant C.O. Jackson, and GRANTED as to

Drew's remaining claims.

## BACKGROUND

**Factual Allegations**

            On October 24, 2015, Drew was held in the upper housing area of the Anna M. Kross

Center ("AMKC").  (Dkt. No. 2: Compl. ¶¶ 7, 12.)  Drew was involved in a disagreement with Correction Officer Milligan-Dixon over moving a chair from the dayroom area.  (Compl. ¶ 8; Ex. B: Not. of Infraction at D 1.)[1/]  Officer Breazeale stated that Drew refused to give C.O. Milligan-Dixon the chair when ordered to do so, and bit C.O. Milligan-Dixon on the arm.  (Not. of Infraction at D 1.)  Officer Breazeale issued Drew an infraction for refusing orders and assaulting staff; Captain Council investigated the incident and found that charges were warranted.  (Not. of Infraction at D 1; Ex. B: Investigation Report at D 2.)

Drew claims that the biting allegation was fabricated as an excuse to transfer him to another facility because, as a member of the inmate council, he cannot be transferred for an infraction unless it involves an assault.  (Ex. C: Drew Dep. at 39.)  Due to this incident, Drew was moved to main intake at AMKC where he awaited transfer to punitive segregation at the George R. Vierno Center ("GRVC").  (Drew Dep. at 36-37.)  While waiting at main intake, Drew told Deputy Wardens Williams and Fadina that his infraction was unfounded.  (Drew Dep. at 37-38.)  Drew alleges that they "failed in their obligation as superior officers to correct the unlawful conduct of those in their charge."  (Compl. ¶ 17.)

Three days later, on October 27, 2015 at approximately 2:51 a.m., Drew left AMKC intake with three other inmates on a bus to GRVC.  (Ex. D: AMKC Main Intake Camera 30.87 at 2:51:53.)  Drew alleges that three unknown correction officers punched him all over his body for five to ten minutes while still on the bus.  (Drew Dep. at 40-41.)  Drew then was taken into GRVC main intake, where he alleges he was assaulted by eight officers.  (Drew Dep. at 42-44.)  Of the eight officers, Drew only was able to identify Officer Jackson.  (Drew Dep. at 42-43.)  This second

[1/]     Unless otherwise noted, all references to exhibits are to those attached to the Saavedra affidavit.  (Dkt. No. 31.)

assault lasted about twenty minutes and consisted of punches and kicks all over Drew's body.  (Drew Dep. at 43-44.)  Drew alleges that during the assault, correction officers threw his property, consisting of medications and religious articles, in the garbage, and threw his legal work all over main intake.  (Drew Dep. at 44-45.)  Drew alleges that the assault left him with a bloody mouth and loose teeth, but no cuts or lacerations.  (Id.)  Drew was removed from GRVC main intake at approximately 5:17 a.m. on October 27, 2015 (AMKC Main Intake Camera 10.75 at 5:16:52), and placed in punitive segregation for ten days after which he was moved into general population at GRVC (Drew Dep. at 47).

On December 20, 2015, Drew alleges that he spoke with Warden Augustus about the alleged false accusations and assault, and that Warden Augustus claimed that he would "check into it" and speak with Deputy Warden Blackman.  (Drew Dep. at 73, 78-79.)  Drew alleges that Warden Augustus failed to intervene to prevent his subordinates' behavior.  (Drew Dep. at 78-79.)  Drew admits that Warden Augustus caused him no physical injury, and Drew is unaware if Warden Augustus was present on the day Drew was assaulted, or the day he was transferred.  (Drew Dep. at 79.)

Drew seeks damages for physical injuries and emotional distress, alleging that he suffered broken ribs, permanent numbness, and scarring on his wrists as well as anxiety attacks, intense anger and depression.  (Compl. ¶ III.)

**Medical Evidence**

On October 28, 2015, Drew reported to LMSW Nina Mazurenko that he was "jumped by DOC staff upon his arrival to [GRVC] and hasn't been seen by medical since.  [Drew] expressed his frustrations about not having an asthma pump and not receiving his asthma meds."  (Ex. D: Closing Report at D 584.)  Mazurenko notified the medical staff and made Drew an appointment.

(Id.)  Later that day, PA Sheila Criss-Horlback examined Drew.  (Closing Report at D 590-92.)  She noted that Drew stated he was injured by GRVC staff upon arrival at GRVC on October 27, 2015, and reported that Drew had mild tenderness to the left orbital and a small contusion, dry blood from the nostrils, swollen lips, tenderness and mild stiffness on the right side of his neck, and strong tenderness on the left middle rib region.  (Closing Report at D 590-91.)  PA Criss-Horlback referred Drew for X-rays.  (Closing Report at D 591-92.)

Later on October 28, 2015, Drew saw RN Jean-Charles and Dr. Frank Flores. (Closing Report at D 593-94.)  Drew alternatively stated that he was jumped or involved in a fight with eight inmates.  (Closing Report at D 593.)[2]  Drew complained of pain and injury in his neck, nose and ribs.  (Closing Report at D 593.)  X-rays revealed that Drew had a closed fracture of his fourth rib.  (Closing Report at D 594.)  During his deposition, Drew admitted that he sustained a prior rib injury in June 2015 that was never treated, and conceded the possibility that his rib injury could be attributable to the prior incident rather than the October 27, 2015 assault.  (Drew Dep. at 55-57; see also Closing Report at D 582-83.)

On November 8, 2015, Dr. Mauricio Silva examined Drew.  (Closing Report at D 595-97.)  Drew told Dr. Silva "that he was involved in a DOC use of force on" October 27, 2015. (Closing Report at D 595.)  Drew stated he had pain to his thoracic wall, an abrasion on his left wrist from handcuffs, and a toothache.  (Id.)  Dr. Silva reported that Drew had a "closed fracture of four

---

[2]     In his deposition, Drew alleged that this medical report was inaccurate; he stated that he told RN Jean-Charles and Dr. Flores that he "was jumped by COs" and that "they misheard because [he] told everyone else correction officers" and that he "never said inmates ever." (Drew Dep. at 52-55.)

ribs,"[3] a "[s]mall superficial excoriation to distal forearm" and "proximal dorsal numbness on radial distribution on left hand."  (Closing Report at D 596.)

**Administrative Remedies: Procedural History**

On November 3, 2015, Drew told the Legal Aid Society "that he was beaten up by multiple officers in GRVC on October 27."  (See Ex. D: Closing Report at D 532.)  The Legal Aid Society reported this allegation to the DOC Investigation Division the same day.  (Closing Report at D 532.)  The Investigation Division investigated the alleged staff-on-inmate assault and issued a report recommending that the "case be closed with no charges" because "the investigation found that Drew's allegation that DOC staff assaulted him in the GRVC Main Intake [to be] unfounded."  (Closing Report at D 533.)

On November 25, 2015, Drew filed an Inmate Grievance and Request Program ("IGRP") Statement Form.  (Ex. E: IGRP Statement at D 512.)  Drew alleged that his "personal property including medications and legal work and radio were removed from [him] during an incident in Main Intake that included Staff on Inmate Assault."  (Id.)[4]  Drew requested that staff

---

[3]     There is some confusion in the medical records as to whether Drew had four fractured ribs or a fracture of his fourth rib.  Dr. Silva's November 8, 2015 report notes the October 28, 2015 diagnosis of a "non displaced fourth rib fracture" but also provides the assessment that Drew suffered a "[c]losed fracture of four ribs."  (Closing Report at D 595-96.)  In his October 28, 2015 report, Dr. Flores writes that Drew has a "[c]losed fracture of four ribs" and "fx of 4th rib."  (Closing Report at D 594.)  An addendum was added to Dr. Flores' report on October 29, 2015 by Peter Wachtel, noting "cl. fx of 4th rib NOT FOUR ribs." (Id.)

[4]     On the IGRP Statement Form, Drew wrote the date of the incident as November 5, 2015. (IGRP Statement at D 512.)  The only allegations in Drew's complaint, however, refer to the events of October 26-27, 2015.  (See generally Dkt. No. 2: Compl.)  It is unclear if the November 5 date is a mistake or if this grievance is about a separate incident.  Since defendants assume the grievance relates to the October 27 incident (see Dkt. No. 28: Def. Br. at 4), the Court resolves this ambiguity in Drew's favor.

"check with Capt. Farrow of 13B to find property or to be reimbursed for lost property." (Id.) An informal resolution to Drew's destruction of property complaint was reached, wherein the "IGRP assured that the grievant received clothes from the clothbox because his property was unable to be located and he was advised of his right to file a claim with the New York City Comptroller's for lost/stolen property . . . ." (Ex. E: IGRP Disposition Form at D 511.) Drew signed the IGRP Disposition Form, checking the box indicating his acceptance of the resolution. (Id.; see Drew Dep. at 69-70.) Drew stated in his deposition that although he was satisfied at the time with the informal resolution and did not appeal it, he has since become unsatisfied with the resolution. (Drew Dep. at 71-72.)

Drew alleges that on November 27, 2015, he filed a separate grievance about the alleged assault. (Drew Dep. at 69-70.) Drew stated that as with his destruction of property claim, he accepted the resolution of his use of force grievance. (Drew Dep. at 70-72.) There are no copies of the separate grievance or Disposition Form in the record.

## ANALYSIS

## I.     SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party

seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct.

1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers

v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd.

P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating

to the Court that there is an absence of evidence to support the non-moving party's case on an issue

on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at

323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than

simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550

U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e]

to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed.

R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587,

106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v.

Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . .

'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any

material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are

to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[5]

The Court draws all inferences in favor of the non-moving party only after determining that such

---

[5]     See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49
(2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New
York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36;
Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

"The Court recognizes that it must extend extra consideration to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions."  Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) (Peck, M.J.) (citations & internal quotations omitted); see, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be read liberally and interpreted "'to raise the strongest arguments that they suggest'").[6]  "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual

---

[6]     See also, e.g., Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006); Fuller v. Armstrong, 204 F. App'x 987, 988 (2d Cir. 2006), cert. denied, 552 U.S. 906, 128 S. Ct. 209

requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Cole v. Artuz, 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[7]

## II.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A.     The PLRA's Exhaustion Requirement

The purpose of the Prison Litigation Reform Act ("PLRA") is "'to reduce the quantity and improve the quality of prisoner suits . . . [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (quoting Porter v. Nussle, 534 U.S. 516, 524-25, 122 S. Ct. 983, 988 (2002)).[8] In furtherance of this objective, 42 U.S.C. § 1997e(a), as amended by the PLRA, provides that a prisoner must exhaust administrative remedies before bringing suit in federal court:

No action shall be brought with respect to prison conditions under section 1983 of

---

(2007); Gildor v. U.S. Postal Serv., 179 F. App'x 756, 758 (2d Cir. 2006); Porter v. Coughlin, 421 F.3d 141, 144 n.2 (2d Cir. 2005); Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003); Johnson v. Buffalo Police Dep't, 46 F. App'x 11, 12 (2d Cir. 2002), cert. denied, 539 U.S. 959, 123 S. Ct. 2645 (2003).

[7]     See also, e.g., United States v. Acomb, No. 99-6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); James v. Phillips, 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); Thompson v. Tracy, 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); Bunting v. Nagy, 452 F. Supp. 2d 447, 454 (S.D.N.Y. 2006); Rodriguez v. McClenning, 399 F. Supp. 2d 228, 234 & n.52 (S.D.N.Y. 2005); Pack v. Artuz, 348 F. Supp. 2d 63, 78 (S.D.N.Y. 2004); Rector v. Sylvania, 285 F. Supp. 2d 349, 353 (S.D.N.Y. 2003); Walker v. Vaughan, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002); Hussein v. The Waldorf-Astoria, 134 F. Supp. 2d 591, 596 (S.D.N.Y. 2001), aff'd, 31 F. App'x 740 (2d Cir. 2002).

[8]     See also, e.g., Woodford v. Ngo, 548 U.S. 81, 93-94, 126 S. Ct. 2378, 2387 (2006); Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012); Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011); Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006).

> this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  This provision requires complete and proper exhaustion in accordance with the prison's administrative procedures.  See, e.g., Woodford v. Ngo, 548 U.S. at 85, 94, 126 S. Ct. at 2382, 2387-88.  The Supreme Court recently reiterated that exhaustion is a mandatory prerequisite to filing suit.  Ross v. Blake, 136 S. Ct. 1850, 1856 (2016) ("As we have often observed, that language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." (quoting Woodford v. Ngo, 548 U.S. at 85, 126 S. Ct. at 2382)).

Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by the administrative procedures.  E.g., Woodford v. Ngo, 548 U.S. at 85, 126 S. Ct. at 2382-83; Porter v. Nussle, 534 U.S. at 524, 122 S. Ct. at 988; Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825 (2001).[9]  The Supreme Court has made clear that the PLRA's exhaustion requirement applies to all prisoner claims:

> [W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

Porter v. Nussle, 534 U.S. at 532, 122 S. Ct. at 992.[10]

---

[9]   See also, e.g., Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009); Beharry v. Ashcroft, 329 F.3d 51, 58 (2d Cir. 2003); Myers v. City of N.Y., 11 Civ. 8525, 2012 WL 3776707 at *3 (S.D.N.Y. Aug. 29, 2012), aff'd, 529 F. App'x 105 (2d Cir. 2013); Peoples v. Fischer, 11 Civ. 2694, 2012 WL 1575302 at *5 (S.D.N.Y. May 3, 2012); Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *7 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.) (citing cases); Rivera v. Pataki, 01 Civ. 5179, 2003 WL 21511939 at *4, *8 (S.D.N.Y. July 1, 2003).

[10]  See also, e.g., Jones v. Bock, 549 U.S. 199, 211, 129 S. Ct. 910, 918-19 (2007); Woodford v. Ngo, 548 U.S. at 85, 126 S. Ct. at 2383 ("exhaustion of available administrative remedies is required for any suit challenging prison conditions"); Johnson v. Killian, 680 F.3d at 238-

The PLRA, however, includes a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" Ross v. Blake, 136 S. Ct. at 1855. "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 136 S. Ct. at 1858.  "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Id. at 1859.

The Supreme Court has provided three examples of situations where administrative remedies are not available and an inmate has no duty to exhaust.  Id.  "First, . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  Id.  Second, if the administrative grievance procedure is so confusing, unnavigable, or opaque that no reasonable inmate could maneuver through the process, administrative remedies are not practically available for use.  Id.  "[F]inally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Id. at 1860.  As the Second Circuit has noted, the "three circumstances discussed in Ross do not appear to be exhaustive, given the [Supreme] Court's focus on three kinds of circumstances that were 'relevant' to the facts of that case."  Williams v. Corr. Officer Priatno, No. 14-4777, 2016 WL 3729383 at *4 n.2 (2d Cir. July 12, 2016).

Nonetheless, "failure to exhaust is an affirmative defense under the PLRA and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints."  Jones

_____

39; Amador v. Andrews, 655 F.3d at 95-96; Brownell v. Krom, 446 F.3d at 310-11.

v. <u>Bock</u>, 549 U.S. 199, 216, 127 S. Ct. 910, 921 (2007); <u>see also</u>, <u>e.g.</u>, <u>Ross</u> v. <u>Blake</u>, 136 S. Ct. at 1855 (defendant "raised the PLRA's exhaustion requirement as an affirmative defense"); <u>Grullon</u> v. <u>City of New Haven</u>, 720 F.3d 133, 141 (2d Cir. 2013); <u>Henning</u> v. <u>N.Y.C. Dep't of Corr.</u>, 14 Civ. 9798, 2016 WL 297725 at *2 (S.D.N.Y. Jan. 22, 2016).

Dismissal of an action for failure to exhaust administrative remedies ordinarily is without prejudice.  <u>E.g.</u>, <u>Woodford</u> v. <u>Ngo</u>, 548 U.S. at 101, 126 S. Ct. at 2392 ("the PLRA exhaustion requirement is not jurisdictional"); <u>Berry</u> v. <u>Kerik</u>, 366 F.3d 85, 87 (2d Cir. 2004) ("As we have noted, '[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw.  If the time permitted for pursuing administrative remedies has not expired, a prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit. . . .'  In such circumstances, we have recognized that dismissal without prejudice is appropriate." (citations omitted)).[11/]

## B.    NYC DOC Grievance Procedures

The New York City Department of Correction ("DOC") has an administrative system in place, the Inmate Grievance and Request Program ("IGRP"), to receive and process inmate complaints. (Ex. F: IGRP Directive at 1.)  To begin the grievance process, an inmate must complete an IGRP Statement Form (Form 7101R), and submit it to a grievance box, the IGRP office, or (for inmates in the SHU) deliver it to an IGRP staff member.  (IGRP Directive ¶ II.F.)  Within two business days, the IGRP staff must provide the inmate with a receipt as proof of the filing, and within five business days must provide an informal resolution to the grievance.  (<u>Id.</u>)  If the inmate

---

[11/]    See also, <u>e.g.</u>, <u>Townsend</u> v. <u>Armstrong</u>, 67 F. App'x 47, 49 (2d Cir. 2003); <u>De La Motte</u> v. <u>Menifee</u>, 40 F. App'x 639, 639 (2d Cir. 2002); <u>Rivera</u> v. <u>Anna M. Kross Center</u>, 10 Civ. 8696, 2012 WL 383941 at *7 (S.D.N.Y. Feb. 7, 2012); <u>Kasiem</u> v. <u>Switz</u>, 756 F. Supp. 2d 578, 578 (S.D.N.Y. 2010).

is not satisfied with the informal resolution, he may appeal to the Inmate Grievance Resolution Committee ("IGRC").  (IGRP Directive ¶ II.G.)  The inmate may appeal the IGRC's decision to the commanding officer of the facility, and may appeal the commanding officer's decision to the Central Office Review Committee ("CORC").  (Id.) CORC's determination constitutes DOC's final decision on the grievance.  (Id.)  "In the event that the inmate does not receive a timely disposition at any stage of the IGRP process, the inmate may submit a request for an appeal (to proceed to the next step of the IGRP process) . . . ."  (IGRP Directive ¶ IV.D.10.a.)

Certain types of grievances including complaints of staff-on-inmate non-sexual assault, are not subject to the IGRP process.  (IGRP Directive ¶ IV.B.2 & App'x A.)  These complaints are referred to the facility's commanding officer "for review and resolution."  (IGRP Directive ¶ IV.B.2 & App'x A.)  When an inmate files a grievance about such an assault, the "IGRP staff shall [fill out and] hand-deliver the completed IGRP Inmate Report of an Alleged Assault/Harassment, (Form 7316R, Attachment D) along with any relevant documentation submitted by the inmate, to the office of the commanding officer on the day of receipt" of the grievance. (IGRP Directive ¶ IV.B.2.b.ii & Attachment D.)  If some of a grievance's allegations are subject to the IGRP process, and some are not, the IGRP staff are to refer the grievances that are subject to referral and process the grievances that remain.  (IGRP Directive ¶ IV.B.2.b.)  When a grievance is referred out of the IGRP process, the IGRP staff are to "explain the referral and instruct the inmate concerning the process' next steps."  (IGRP Directive ¶ IV.B.2.)

The materials in the record provide no instruction on what process or procedures grievances follow once they are referred out of the IGRP process, other than being passed on to the commanding officer.  It would seem intuitive for such complaints to still be subject to appeal to the CORC.  The IGRP Directive's repeated statement, however, that such grievances are "not subject"

to the IGRP process and shall be "forward[ed] . . . for review and resolution" (IGRP Directive ¶ IV.B.2 & App'x A), demonstrates that referrals are moved entirely outside of the formal grievance process.  Moreover, instructing IGRP staff to provide the inmate with an IGRP Disposition Form that includes "information regarding the entity to which the matter was referred, and what process is available to address the condition or issue" further indicates that the relevant process is not already provided in the IGRP Directive.  (IGRP Directive ¶ IV.G.3.a.)  Without information on the administrative process that controls once a matter is referred outside of the IGRP, the Court only can speculate as to what it might be or whether one even exists.

The Court also is left to speculate as to whether there is an appeals process for the DOC Investigation Division's Closing Report.  (See Closing Report at D 532-37.)  The IGRP Directive states that "[t]he dispositions stemming from a program or procedure that has its own departmental administrative or investigative process are not subject to the IGRP process."  (IGRP Directive ¶ IV.B.2.a.)  Defendants, however, do not provide information on the Investigation Division's administrative procedures.

## III.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON DREW'S ASSAULT CLAIM

### A.    Drew Did Not Fail To Exhaust The Administrative Remedies For His Staff-On-Inmate Assault Claim

In his grievance, Drew complained that his "personal property including medications and legal work and radio were removed from [him] during an incident in Main Intake that included Staff on Inmate Assault."  (Ex. E: IGRP Statement at D 512.)  The IGRP staff processed the destruction of property portion of Drew's grievance.  (Ex. E: IGRP Disposition at D 511.)  There is no evidence in the record, however, that IGRP staff referred Drew's assault allegation to the GRVC

commanding officer, as required by the IGRP Directive.   (See page 13 above.)[12/]   The record

contains no copy of a completed IGRP Inmate Report of an Alleged Assault/Harassment (Form

7316R), or a completed IGRP Disposition Form explaining the referral and the next steps in the

process.   The only completed IGRP Disposition Form in the record is the one resolving Drew's

destruction of property claim.   (IGRP Disposition at D 511.)   This completed form is missing the

second page, where the referral should have been noted at the top and the box marked "Next Steps"

should have been filled out.   (IGRP Disposition at D 511; Ex. F: IGRP Directive Attachment C.)

If Drew's assault claim was not referred, the IGRP Directive provides no remedy.

The IGRP Directive only instructs Drew to re-file an initial IGRP Statement Form if within two

business days he does not receive a receipt that the IGRP staff received his complaint.   (IGRP

Directive ¶ IV.D.8.b; see page 12 above.)   There is no allegation that the IGRP did not receive

Drew's property and assault grievance (a copy of which defendants submitted to the Court), or that

Drew did not obtain a receipt.   (See pages 5-6 above.)   If Drew's assault claim was referred to the

commanding officer, there is no evidence to suggest what procedure Drew should have followed in

dealing with the commanding officer's response (or lack thereof) once his claim was removed from

the IGRP process.   (See pages 13-14 above.)   If he received no response, Drew could not have

requested "to proceed to the next step of the IGRP process" due to lack of a timely decision because

his staff-on-inmate assault claim is not subject to the appeal procedures set out in the IGRP

---

[12/]     Drew stated in his deposition that he also filed a separate grievance focusing specifically on
the staff-on-inmate assault allegation, and that he accepted a resolution to this grievance.
(See page 6 above.)   There is no copy of this grievance in the record.   Whether or not the
grievance actually was filed is immaterial because defendants make no argument that it
supports their exhaustion argument.   Indeed, the alleged second grievance is not mentioned
at all in defendants' brief, and accordingly defendants cannot meet their burden of
establishing the affirmative defense of failure to exhaust in reliance on this grievance.

Directive.  (See pages 13-14 above.)

The Court reaches the same conclusion with regard to the DOC Investigation Division's Closing Report that found Drew's assault allegations to be unfounded.  (See page 5 above.)  There is no information in the record describing the administrative procedures of the Investigation Division or the steps an inmate may take to appeal the findings of the Closing Report, if such an appeals process exists.  Defendants, moreover, do not allege that Drew failed to appeal the findings of this report or exhaust any administrative remedies that followed its issuance.  (See Dkt. No. 28: City Br. at 8-9.)

The circumstances of this case are similar to those recently analyzed by the Second Circuit in Williams v. Corr. Officer Priatno, 14 Civ. 4777, 2016 WL 3729383 at *2 (2d Cir. July 12, 2016), in which an inmate handed a complaint of a staff-on-inmate assault to a correction officer to forward to the grievance office on his behalf, but the grievance never was filed.  Id.  The DOC defendants argued that the plaintiff failed to exhaust because he could have appealed his unfiled grievance.  Id. at *5.  Nevertheless, the Second Circuit "conclud[ed] that the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that . . . no reasonable prisoner can use [it].'"  Id. (quoting Ross v. Blake, 136 S. Ct. at 1859).  "The regulations," the Second Circuit found, "simply do not contemplate the situation in which [the plaintiff] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance."  Id.

Here, Drew faced a similar situation not directly contemplated by the IGRP regulations, which other courts in the Second Circuit have found not subject to the grievance process in similar circumstances.  See, e.g., Campbell v. Ponte, 15 Civ. 8048, 2016 WL 3948103 at *3 (S.D.N.Y. July 19, 2016) ("At Rikers Island, [plaintiff's] complaint . . . would be 'not grievable,' and therefore not covered by that [IGRP] process, if it involved allegations of 'assault . . . .'" (citation

omitted)); Tartt v. City of N.Y., 12 Civ. 5405, 2014 WL 3702594 at *4 (S.D.N.Y. July 16, 2014) ("[Plaintiff] and Defendants agree that 'Plaintiff's excessive force claim is not subject to the DOC grievance process.' Defendants do not argue here that there is <u>any</u> administrative process through which [plaintiff] should have submitted his complaint of excessive force." (record citation omitted, emphasis in original)); Taylor v. Swift, 21 F. Supp. 3d 237, 241 (E.D.N.Y. 2014) (Weinstein, D.J.) ("City Defendants withdrew their non-exhaustion argument with respect to plaintiff's excessive force claim, conceding that plaintiff's claim against Defendant Benbow 'appears to assert an actual [non-grievable] assault by this Defendant.'"), appeal dismissed (Mar. 10, 2015).

Because failure to exhaust administrative remedies is an affirmative defense, defendants must provide the Court with evidence of the administrative remedies that Drew has not exhausted with respect to his staff assault claim. They have failed to do so and, as a result, are not entitled to summary judgment in this regard.

## B. Questions Of Fact Preclude Summary Judgment On Drew's Excessive Force Claim

Defendants contend that even if Drew's excessive force claim is not barred by a failure to exhaust, it should be dismissed because no reasonable jury could believe his allegations, which "are simply incredible and contradicted by various pieces of evidence in the record." (Dkt. No. 28: Def. Br. at 11-12.) To the contrary, medical evidence demonstrates that Drew was diagnosed with a broken rib the day after the alleged assault, in addition to having swollen lips, dried blood from the nostrils, tenderness to the left orbital and a contusion. (See pages 3-4 above.) While Drew conceded the possibility that his rib injury may have been caused by a prior, unrelated incident (see page 4 above), defendants point to no evidence proving the injury was not related to the October 27, 2015 assault. Drew furthermore claimed that the medical record stating he had been assaulted

by prison inmates, rather than staff, was incorrect.  (See page 4 n.2 above.)  These are material fact issues for a jury.

Defendants further argue that video surveillance footage, provided for the Court as part of the Investigation Division Closing Report, "clearly contradicts" Drew's allegations that he was beaten in GRVC main intake.  (See Def. Br. at 12.)  Several of the five GRVC camera feeds, however, have missing periods of time throughout the footage.  One such camera (11.227, GRVC-Intake-Manhattan-Pens) is missing over thirty minutes of the eighty minutes covered by the footage. Without witness testimony explaining the footage and the layout of GRVC main intake, and testimony about what occurred while Drew was off camera in GRVC main intake, the Court cannot determine, as a matter of law, that no reasonable jury could find for Drew.  At this stage, the evidence is inconclusive and thus must be resolved by a jury.  Accordingly, defendants' summary judgment motion is denied as to Drew's excessive force claim against C.O. Jackson.

## IV.   DEFENDANTS ARE GRANTED SUMMARY JUDGMENT ON DREW'S REMAINING CLAIMS

Defendants argue that Drew's property deprivation claim fails because New York provides an adequate post-deprivation remedy.  (Dkt. No. 28: Def. Br. at 9-11.)

To the extent that Drew claims that he was deprived of his personal property without due process of law, "such claim is barred where the state provides a meaningful post-deprivation remedy under state law."  Omor v. City of N.Y., 13 Civ. 2439, 2015 WL 857587 at *8 (S.D.N.Y. Feb. 27, 2015) (citing Hudson v. Palmer, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available."))  The Second Circuit has applied

this principle to find that if the state provides an adequate post-deprivation remedy, a "random and unauthorized" deprivation of property will not give rise to a § 1983 claim.  Butler v. Castro, 896 F.2d 698, 700 (2d Cir. 1990); see also, e.g., Attallah v. N.Y. Coll. of Osteopathic Med., 643 F. App'x 7, 9-10 (2d Cir. 2016); Abraham v. N.Y.C. Police Dep't, No. 15CV5208, 2016 WL 3181125 at *3 (E.D.N.Y. June 3, 2016); Banks v. Cty. of Westchester, 13 Civ. 5254, 2016 WL 951603 at *8 (S.D.N.Y. Mar. 9, 2016) ("District courts thus routinely dismiss claims by inmates who assert that they were deprived of property by corrections officers."); Watts v. N.Y.C. Police Dep't, 100 F. Supp. 3d 314, 328 (S.D.N.Y. 2015); Ruane v. Cty. of Suffolk, No. CIV. A. 12-1658, 2015 WL 2337329 at *9 n.6 (E.D.N.Y. May 13, 2015).

Further, "the Second Circuit has determined that 'New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action.'"  Acevedo v. Fischer, 12 Civ. 6866, 2014 WL 5015470 at *13 (S.D.N.Y. Sept. 29, 2014) (quoting Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001)); see also, e.g., Abraham v. N.Y.C. Police Dep't, 2016 WL 3181125 at *3; Banks v. Cty. of Westchester, 2016 WL 951603 at *8; Toliver v. City of N.Y., 10 Civ. 5806, 2013 WL 6476791 at *7 (S.D.N.Y. Dec. 10, 2013) ("It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing through state law causes of action for 'negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss.'"), R. & R. adopted, 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014). Accordingly, a claim in New York for a random and unauthorized property deprivation is barred from federal court review.

Drew presents no evidence to suggest that the alleged property deprivation was not "random and unauthorized."  Drew's "'failure to take advantage'" of the post-deprivation remedy provided by New York State law "'does not convert his cause of action into a constitutional due

process claim.'" <u>Watts</u> v. <u>N.Y.C. Police Dep't</u>, 100 F. Supp. 3d at 329.  As New York provides an adequate post deprivation remedy, and Drew fails to show that the alleged property deprivation was not a "random and unauthorized" act, this claim is dismissed without prejudice to Drew utilizing New York's post-deprivation remedies.[13/]

## V.   DEFENDANTS FADINA AND AUGUSTUS ARE GRANTED SUMMARY JUDGMENT DISMISSING DREW'S CLAIMS AGAINST THEM

### A.   Legal Standard For Personal Involvement In A § 1983 Case

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority.  Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." <u>Victory</u> v. <u>Pataki</u>, 814 F.3d 47, 67 (2d Cir. 2016) (citation & quotations omitted); <u>Warren</u> v. <u>Pataki</u>, 823 F.3d 125, 136 (2d Cir. 2016); <u>Littlejohn</u> v. <u>City of N.Y.</u>, 795 F.3d 297, 314 (2d Cir. 2015).  Vicarious liability does not apply to § 1983 suits.  <u>Victory</u> v. <u>Pataki</u>, 814 F.3d at 67; <u>e.g.</u>, <u>Littlejohn</u> v. <u>City of N.Y.</u>, 795 F.3d at 314; <u>Wright</u> v. <u>Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged

---

[13/]   Defendants additionally argue that Drew's property deprivation claim, and any other claims in this lawsuit, are barred because Drew did not proceed past step one of the grievance process, and filed no other grievances that address his other claims.  (Def. Br. at 9.)  Drew terminated the IGRP process by accepting an informal resolution to his property claim at step one of the process, and, by doing so, failed to avail himself of the remaining available administrative remedies.  Drew's allegation that the use of force investigation prompted DOC staff to initiate "additional acts of harassment . . . such as unauthorized confiscation of personal property on 12/30/15 and 1/8/16 that have left [him] afraid of filing any future grievances" (Dkt. No. 2: Compl. at 5), is too vague to support a determination that prison officials thwarted his exhaustion efforts.  (<u>See</u> page 11 above.)  "[T]he PLRA exhaustion requirement requires proper exhaustion." <u>Woodford</u> v. <u>Ngo</u>, 548 U.S. 81, 93, 126 S. Ct. 2378, 2387 (2006); <u>see also</u> cases cited at pages 9-11 above.  Thus, besides Drew's excessive force claim, defendants' motion for summary judgment is granted as to Drew's remaining claims for failure to exhaust.

constitutional deprivations is a prerequisite to an award of damages under § 1983.'"); see, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Murphy v. Cty. of Chemung (In re Murphy), 482 F. App'x 624, 627 (2d Cir. 2012); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010); Warheit v. City of N.Y., 271 F. App'x 123, 126 (2d Cir. 2008); Dyno v. Vill. of Johnson City, 240 F. App'x 432, 434 (2d Cir. 2007), cert. denied, 552 U.S. 1310, 128 S. Ct. 1874 (2008).[14]

In 1995, the Second Circuit held that:

[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that

---

[14]     See also, e.g., Warren v. Pataki, 823 F.3d at 136; Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006); Gill v. Tuttle, 93 F. App'x 301, 302 (2d Cir. 2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093, 125 S. Ct. 971 (2005); Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Russo v. DiMilia, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012); Robles v. Khahaifa, No. 09CV718, 2012 WL 2401574 at *8 (W.D.N.Y. June 25, 2012); Allan v. Woods, No. 05-CV-1280, 2008 WL 724240 at *5 (N.D.N.Y. Mar. 17, 2008) ("Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability."); Tafari v. Annets, 06 Civ. 11360, 2008 WL 2413995 at *10 (S.D.N.Y. June 12, 2008) (Peck, M.J.), R. & R. adopted, 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008) (Daniels, D.J.), aff'd, 363 F. App'x 80 (2d Cir.), cert. denied, 130 S. Ct. 3475 (2010); Zamakshari v. Dvoskin, 899 F. Supp. 1097, 1109 (S.D.N.Y. 1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of respondeat superior does not apply to § 1983 actions.").

unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d at 873.[15/]  However, in 2009, the Supreme Court held that:

> In a § 1983 suit . . . —where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer.  Absent vicarious liability, each Government official, his or her title not withstanding, is only liable for his or her own misconduct.  In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose . . . liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

Ashcroft v. Iqbal, 556 U.S. at 677, 129 S. Ct. at 1949.  The Second Circuit has not weighed in on what remains of Colon after Iqbal.  See, e.g., Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("Iqbal has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in Colon v. Coughlin . . . .").[16/]  Several decisions in this

---

[15/]     Accord, e.g., Ziemba v. Clark, 167 F. App'x 831, 833 (2d Cir. 2006); Samuels v. Selsky, 166 F. App'x 552, 556 (2d Cir. 2006); Patterson v. Cty. of Oneida, 375 F.3d 206, 229 (2d Cir. 2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d at 127; Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003); Hernandez v. Keane, 341 F.3d at 145; Wright v. Smith, 21 F.3d at 501; see also, e.g., Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).

[16/]     See also, e.g., Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal."); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) ("Although the Supreme Court's decision in [Iqbal] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations, we need not reach Iqbal's impact on Colon in this case . . . ."); Olutosin v. Lee, 14 Civ. 685, 2016 WL 2899275 at *13 (S.D.N.Y. May 16, 2016) ("Following the Supreme Court's decision in Iqbal, the viability of all of the Colon factors has been called into question and remains unresolved in the Second Circuit."); McLennon v. City of N.Y., No. 14-CV-6320, 2016 WL 1089258 at *19 n.10 (E.D.N.Y. Mar. 18, 2016) ("In the years since Iqbal was decided, the Second Circuit has not resolved Iqbal's effect, if any, on Colon."); Morgan v. Ward, 14 Civ. 7921, 2016 WL 427913 at *6 n.5 (S.D.N.Y. Feb. 2, 2016) ("Following the Supreme Court's decision in Iqbal, there has been some question, so far unresolved by the Second Circuit, as to whether Iqbal heightened the requirements for showing of a supervisor's personal involvement with respect to certain constitutional violations, and, therefore, foreclosed some of the Colon categories.").

Circuit, however, have concluded that by specifically rejecting the argument that "'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution,'" Iqbal effectively nullified several of the classifications of supervisory liability enunciated by the Second Circuit in Colon.  Reynolds v. Barrett, 685 F.3d at 205 n.14; see, e.g., Bellamy v. Mount Vernon Hosp., 07 Civ. 1801, 2009 WL 1835939 at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.  The other Colon categories impose the exact types of supervisory liability that Iqbal eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."), aff'd, 387 F. App'x 55 (2d Cir. 2010).[17/]  While Colon permitted supervisory liability

---

[17/]    See also, e.g., Marom v. City of N.Y., 15 Civ. 2017, 2016 WL 916424 at *15 (S.D.N.Y. Mar. 7, 2016) ("In the absence of binding precedent, district courts in this Circuit have divided into two camps.  Some courts hold that Iqbal categorically eliminated the second, fourth, and fifth Colon factors.  While other courts hold that the viability of the second, fourth, and fifth Colon factors depends on the underlying constitutional claim." (citations omitted)); Carter v. Bezio, No. 12-CV-1746, 2015 WL 1400555 at *5 n.2 (N.D.N.Y. Mar. 26, 2015) ("While some courts have taken the position that only the first and third of the five Colon categories remain viable and can support a finding of supervisory liability, others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role." (citations omitted)); Ciaprazi v. Fischer, 13 Civ. 4967, 2015 WL 1315676 at *2 n.2 (S.D.N.Y. Mar. 24, 2015) ("This Court shares a general skepticism that the five Colon factors all pass muster under Iqbal."); Eldridge v. Williams, 10 Civ. 0423, 2013 WL 4005499 at *4 n.5 (S.D.N.Y. July 30, 2013) (Iqbal "may have narrowed the viability of some of the Colon predicates for supervisory liability"); Liner v. Fischer, 11 Civ. 6711, 2013 WL 3168660 at *7 (S.D.N.Y. June 24, 2013) ("[C]ourts in this Circuit are divided as to how many of the Colon factors survive in the wake of Iqbal." (comparing cases)), R. & R. adopted, 2013 WL 4405539 (S.D.N.Y. Aug. 7, 2013); Hobbs v. Police Officers of City of N.Y., 10 Civ. 5717, 2013 WL 2985899 at *8 & n.5 (S.D.N.Y. June 17, 2013); Curtis v. Williams, 11 Civ. 1186, 2013 WL 1915447 at *5 (S.D.N.Y. May 9, 2013); Doe v. New York, No. 10 CV 1792, 2012 WL 4503409 at *8 & n.3 (E.D.N.Y. Sept. 28, 2012); Vann v. Fischer, 11 Civ. 1958, 2012 WL 2384428 at *5 & n.9 (S.D.N.Y. June 21, 2012) ("In the Second Circuit, personal

in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate, these post-Iqbal district court decisions reason that Iqbal's "active conduct" standard imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred.

These decisions may overstate Iqbal's impact on supervisory liability. Iqbal involved allegations of intentional discrimination. Ashcroft v. Iqbal, 556 U.S. at 666, 129 S. Ct. at 1942. Where the alleged constitutional violation involved "invidious discrimination in contravention of the First and Fifth Amendments," Iqbal held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether the defendant is a subordinate or a supervisor. Id. at 676-77, 129 S. Ct. at 1948-49. It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Id. at 677, 129 S. Ct. at 1949. Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement

_____

involvement in intentional discrimination is shown where 'the defendant participated directly in the alleged constitutional violation, [or] . . . the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom . . . .'"  "These are only the first and third scenarios listed in Colon in which personal involvement might be found, but the others have been invalidated by the Supreme Court's holding in Iqbal . . . ."); James v. Orange Cty. Corr. Facility, 09 Civ. 7226, 2011 WL 5834855 at *4 (S.D.N.Y. Nov. 18, 2011) ("There has been considerable division among the district courts of the Second Circuit as to whether Iqbal abrogates several factors of the Colon test and if so to what extent." (citing cases)); Joseph v. Fischer, 08 Civ. 2824, 2009 WL 3321011 at *14 (S.D.N.Y. Oct. 8, 2009) ("[U]nder Iqbal, . . . [a] defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right."); Newton v. City of N.Y., 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in Ashcroft v. Iqbal.").

analysis set forth in <u>Colon</u> may still apply.[18/]

Drew claims that on October 25, 2015, he told Fadina that the accusation that he bit another officer, which led to Drew's transfer to GRVC, was fabricated.  (<u>See</u> page 2 above.)  Drew alleges that Fadina "refused to intervene on [his] behalf" and "failed in [his] obligation as superior officer[] to correct the unlawful conduct of those in [his] charge."  (Dkt. No. 2: Compl. ¶¶ 16-17; <u>see</u> page 2 above.)  Drew further claims that he spoke with Warden Augustus on December 20, 2015 about the alleged false accusations and assault, and that Warden Augustus claimed that he would

---

[18/]    <u>See</u>, <u>e.g.</u>, <u>Hill</u> v. <u>Laird</u>, No. 06-CV-0126, 2016 WL 3248332 at *5 (E.D.N.Y. June 13, 2016) ("The Second Circuit has not yet determined <u>Iqbal</u>'s impact on non-discrimination claims . . . ."); <u>Marom</u> v. <u>City of N.Y.</u>, 2016 WL 916424 at *15; <u>Hernandez</u> v. <u>Goord</u>, 01 Civ. 9585, 2013 WL 2355448 at *7 (S.D.N.Y. May 29, 2013) ("And even after the U.S. Supreme Court's decision in <u>Iqbal</u>, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.'"); <u>Zappulla</u> v. <u>Fischer</u>, 11 Civ. 6733, 2013 WL 1387033 at *9 (S.D.N.Y. Apr. 5, 2013) (holding that "where a plaintiff has alleged a claim that does not include a discriminatory intent element, such as a claim under the Eighth Amendment for denial of medical treatment, the <u>Colon</u> test should still apply" and collecting cases "holding that <u>Colon</u> continues to apply at least where the alleged constitutional claim does not involve a discriminatory intent element"); <u>Inesti</u> v. <u>Hogan</u>, 11 Civ. 2596, 2013 WL 791540 at *12 (S.D.N.Y. Mar. 5, 2013) (Peck, M.J.), <u>R. & R. adopted</u>, 2013 WL 5677046 (S.D.N.Y. Sept. 30, 2013); <u>Smolen</u> v. <u>Fischer</u>, 12 Civ. 1856, 2012 WL 5928282 at *5 (S.D.N.Y. Nov. 27, 2012) (Peck, M.J.), <u>R. & R. adopted</u>, 2013 WL 765315 (S.D.N.Y. Feb. 28, 2013); <u>Alli</u> v. <u>City of N.Y.</u>, 11 Civ. 7665, 2012 WL 4887745 at *6 (S.D.N.Y. Oct. 12, 2012) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in <u>Colon</u> should still apply."); <u>Inesti</u> v. <u>Hicks</u>, 11 Civ. 2596, 2012 WL 2362626 at *11 (S.D.N.Y. June 22, 2012) (Peck, M.J.), <u>R. & R. adopted</u>, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012); <u>Hodge</u> v. <u>Sidorowicz</u>, 10 Civ. 428, 2011 WL 6778524 at *16 (S.D.N.Y. Dec. 20, 2011), <u>R. & R. adopted</u>, 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012); <u>Sash</u> v. <u>United States</u>, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Chao</u> v. <u>Ballista</u>, 630 F. Supp. 2d 170, 178 n.2 (D. Mass. July 1, 2009) (noting that the "state of mind required to make out a supervisory claim under the Eighth Amendment—i.e., deliberate indifference—requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit . . . ."); Michael Avery et al., <u>Police Misconduct: Law & Litigation</u> § 4:5 (2009) (discussing the impact of <u>Iqbal</u> on supervisor liability in § 1983 and <u>Bivens</u> actions); <u>cf.</u> <u>Caiozzo</u> v. <u>Koreman</u>, 581 F.3d 63, 66 (2d Cir. 2009) (the standard is the same for Eighth Amendment and Fourteenth Amendment deliberate indifference claims).

"check into it" and speak with Deputy Warden Blackman.  (See page 3 above.)  Drew alleges that Warden Augustus failed to intervene to prevent his subordinates' harassing behavior on "October 27 and December 1."  (Drew Dep. at 78-79.)  Drew admits that Warden Augustus caused him no physical injury, and Drew is unaware if Warden Augustus was present on the day Drew was assaulted, or the day he was transferred.  (See page 3 above.)

Drew fails to allege any personal involvement in his alleged unconstitutional treatment by Deputy Warden Fadina or Warden Augustus.  Drew only alleges that he told Deputy Warden Fadina that the biting accusation against him was false, which occurred prior to the alleged use of excessive force during Drew's transfer to GRVC, and that he informed Warden Augustus about the assault after the fact at which time Warden Augustus said he would "check into it."  Drew presents no evidence that Deputy Warden Fadina or Warden Augustus directly participated in the assault, that their action or inaction proximately caused the assault, that they should have known it might occur, or that any of the Colon factors otherwise suggests their personal involvement in this discrete incident.

While Warden Augustus eventually was informed of the assault, the Court is persuaded by Judge Sand's analysis that an "alleged constitutional violation complained of . . . must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy [it] directly.'"  Burton v. Lynch, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009).[19]/  This distinction is sensible given that the plaintiff must prove that "the supervisor's actions

_____

[19]/    See also, e.g., Platt v. Inc. Vill. of Southampton, 391 F. App'x 62, 65 (2d Cir. 2010) ("We cannot say, however, that an allegation that a supervisory official ignored a letter protesting past unconstitutional conduct is, without more, sufficient to state a claim that the official was 'personally involved' in the unconstitutional conduct."); Gutierrez v. Reddien, No. 15-CV-0822-A, 2016 WL 4245359 at *3 (W.D.N.Y. Aug. 11, 2016) ("'After the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the

were the proximate cause of [his] constitutional deprivation." Raspardo v. Carlone, 770 F.3d 97,

116 (2d Cir. 2014) (emphasis added). Although Drew vaguely claims that he informed Warden

Augustus about a pattern of unspecified harassment, he only points to the one instance of excessive

force that occurred following his transfer to GRVC and before he met with Warden Augustus. (See

pages 2-3 above.) Warden Augustus was not in a position to remedy such past unconstitutional

conduct.

Therefore, because "'[a] defendant in a § 1983 action may not be held liable for

damages for constitutional violations merely because he held a high position of authority'" Victory

v. Pataki, 814 F.3d at 67, and Drew has not presented any evidence to suggest that Deputy Warden

Fadina or Warden Augustus was personally involved in C.O. Jackson's alleged use of excessive

force, Drew's claims against Deputy Warden Fadina and Warden Augustus are dismissed.

## VI. THE CITY OF NEW YORK IS ENTITLED TO SUMMARY JUDGMENT ON DREW'S MONELL CLAIM

### A. Legal Standards Governing Municipal Liability Claims

It is well established that a municipality may not be held liable under Section 1983

for alleged unconstitutional actions by its employees below the policy-making level solely upon the

---

violation.'"); Powell v. City of N.Y., 14 Civ. 09937, 2016 WL 4159897 at *11 (S.D.N.Y.
July 14, 2016), R. & R. adopted, 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016); McIntosh v.
United States, 14 Civ. 7889, 2016 WL 1274585 at *16 (S.D.N.Y. Mar. 31, 2016) ("[M]ere
receipt of a complaint or grievance from an inmate is insufficient to establish personal
involvement . . . ."); Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687 at *6 n.11
(W.D.N.Y. Mar. 14, 2016), R. & R. adopted, 2016 WL 3031353 (W.D.N.Y. May 27, 2016);
Phillip v. Schriro, 12 Civ. 8349, 2014 WL 4184816 at *5 (S.D.N.Y. Aug. 22, 2014); Rahman
v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("After the fact notice of a violation of
an inmate's rights is insufficient to establish a supervisor's liability for the violation.
Receiving post hoc notice does not constitute personal involvement in the unconstitutional
activity and cannot be said to have proximately caused the damage suffered by the inmate.").

basis of respondeat superior.  E.g., Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978); Johnson v. N.Y.C. Police Dep't, No. 15-1379, 2016 WL 3277261 at *2 (2d Cir. June 8, 2016); Littlejohn v. City of N.Y., 795 F.3d 297, 314-15 (2d Cir. 2015); Patterson v. Cty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004); DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998); Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995); Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991).[20]  Rather, in order to hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that the violation of constitutional rights resulted from a municipal custom or policy.  See, e.g., Connick v. Thompson, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359 (2011); Pembaur v. City of Cincinnati, 475 U.S. 469, 478-83, 106 S. Ct. 1292, 1297-300 (1986); Johnson v. N.Y.C. Police Dep't, 2016 WL 3277261 at *2; Littlejohn v. City of N.Y., 795 F.3d at 314-15; Costello v. City of Burlington, 632 F.3d 41, 49 (2d Cir. 2011); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).[21]

The plaintiff need not identify an explicit, official policy or practice.  See, e.g., Littlejohn v. City of N.Y., 795 F.3d at 314-15; Newton v. City of N.Y., 779 F.3d 140, 152 (2d Cir. 2015), cert. denied, 136 S. Ct. 795 (2016); Prince v. Cty. of Nassau, 563 F. App'x 13, 16 (2d Cir. 2014); Patterson v. Cty. of Oneida, 375 F.3d at 226; Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864,

---

[20]   See also, e.g., White v. Cty. of Dutchess, 15 Civ. 8744, 2016 WL 4449720 at *5 (S.D.N.Y. Aug. 23, 2016); Walker v. Ponte, 14 Civ. 8507, 2016 WL 4411415 at *8 (S.D.N.Y. Aug. 18, 2016); Muhammad v. N.Y.C., 15 Civ. 5603, 2016 WL 4367970 at *5 (S.D.N.Y. Aug. 12, 2016); Roberts v. City of N.Y., 14 Civ. 5198, 2016 WL 4146135 at *7 (S.D.N.Y. Aug. 2, 2016).

[21]   See also, e.g., Masciotta v. Clarkstown Cent. Sch. Dist., 14 Civ. 7128, 2016 WL 4449660 at *11 (S.D.N.Y. Aug. 23, 2016); Jones v. City of N.Y., No. 16-CV-1289, 2016 WL 4435220 at *2 (E.D.N.Y. Aug. 19, 2016); Walker v. Ponte, 2016 WL 4411415 at *8; Sanabria v. Tezlof, 11 Civ. 6578, 2016 WL 4371750 at *8 (S.D.N.Y. Aug. 12, 2016); Muhammad v. N.Y.C., 2016 WL 4367970 at *5; Roberts v. City of N.Y., 2016 WL 4146135 at *7.

870 (2d Cir. 1992).[22/]  It is sufficient to show a widespread pattern of behavior that constitutes a "custom or usage with the force of law" or "the constructive acquiescence of senior policy-making officials." Patterson v. Cty. of Oneida, 375 F.3d at 226 (quotations omitted); see, e.g., Connick v. Thompson, 563 U.S. at 61, 131 S. Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); Belpasso v. City of N.Y., 07 Civ. 3627, 2008 WL 2676579 at *5 (S.D.N.Y. July 2, 2008); Gorton v. Gettel, 04 Civ. 0236, 2007 WL 2154193 at *9 (S.D.N.Y. June 22, 2007), aff'd, 554 F.3d 60 (2d Cir. 2009).  "A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" Patterson v. Cty. of Oneida, 375 F.3d at 226; see, e.g., Connick v. Thompson, 563 U.S. at 61, 131 S. Ct. at 1359.  Any analysis of an allegation of municipal liability under § 1983 begins with "the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989).

Drew's Monell claim hinges on a single, isolated incident of excessive force (see pages 2-3 above), allegedly committed by C.O. Jackson and other corrections officers, who are not alleged to have any municipal policymaking authority.  These allegations are insufficient to withstand summary judgment. See, e.g., Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) ("isolated acts of excessive force by non-policymaking municipal employees are generally not

---

[22/]    See also, e.g., White v. Cty. of Dutchess, 2016 WL 4449720 at *5-6; Campbell v. Ponte, 15 Civ. 8048, 2016 WL 3948103 at *4 (S.D.N.Y. July 19, 2016); Cofield v. Nassau Cty., No. 15CV5768, 2016 WL 3460377 at *3 (E.D.N.Y. June 21, 2016); Goodwine v. City of N.Y., 15 Civ. 2868, 2016 WL 3017398 at *9 (S.D.N.Y. May 23, 2016); Thomsen v. City of N.Y., 15 Civ. 2668, 2016 WL 590235 at *10 (S.D.N.Y. Feb. 11, 2016), appeal withdrawn (May 23, 2016).

sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability."), cert. denied, 134 S. Ct. 125 (2013); Maco v. Baldwin Union Free Sch. Dist., No. CV 15-3958, 2016 WL 4028274 at *6 (E.D.N.Y. July 26, 2016); Hyman v. Cty. of Albany, No. 913CV770, 2016 WL 2865711 at *13 (N.D.N.Y. Mar. 31, 2016); Sherman v. Platosh, No. 15-CV-352, 2016 WL 146431 at *4 (D. Conn. Jan. 12, 2016); Hixon v. City of N.Y., 14 Civ. 02504, 2015 WL 4470078 at *4 (S.D.N.Y. July 13, 2015).

        Moreover, the only allegations that relate to the alleged assault on Drew that involve potential municipal policymaking officials are those regarding Warden Augustus and Capt. Rollison. Drew presents no evidence that Warden Augustus, Capt. Rollison, or any other DOC official "ordered or ratified the subordinates' actions," was deliberately indifferent to any constitutional deprivations that occurred, or "was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004).  Drew states that Warden Augustus's decision to ignore the actions of the offending officers with respect to "misbehavior reports and uses of force demonstrates a conspiracy" among the defendants (Compl. ¶ 32), and that DOC officers have a policy of retaliating against inmates who allegedly assault staff members (Drew Dep. at 41-42, 79-80).  Drew speculates that Captain Rollison ordered the assault:

        Q.     How do you know [Captain Rollison] gave those orders?

        A.     Because he was the intake captain at the time I arrived at GRVC.

        Q.     You are assuming because he was the captain, he gave the orders?

        A.     Absolutely.  Also, because the captain is the only one that knows why I was in GRVC.  No one else can know that.  That is the information the captain has.

(Drew Dep. at 73.)  After the assault, Drew was escorted from GRVC main intake to the punitive

segregation unit and saw Capt. Rollison on the way out; Drew claims that Capt. Rollison was present at GRVC for the duration of the assault.  (Drew Dep. at 45-46.)

Warden Augustus's admittedly pro forma response that he would "check into" Drew's assault claim, and Capt. Rollison's role as the on-duty captain the night of the assault, standing alone, do not establish municipal liability.  Drew's allegation that Capt. Rollison must have ordered the assault given his position as captain and presence at GRVC the night of the incident is entirely speculative, as is his claim that Warden Augustus was involved in a "conspiracy" to assault inmates. Drew details no other similar instances of DOC staff misconduct, or any other evidence that DOC officials had a policy or practice of tolerating such misconduct.  See, e.g., Connick v. Thompson, 563 U.S. at 61, 131 S. Ct. at 1359 (municipal liability rests on "practices so persistent and widespread as to practically have the force of law").  While incidents of excessive force at Rikers Island have been reported in the press and were the subject of a reported investigation by the SDNY U.S. Attorney's Office, none of that is in the record before the Court.  Drew's vague and conclusory allegations, absent any other evidence, do not suffice to subject the City to liability.  See, e.g., Vail v. City of N.Y., 68 F. Supp. 3d 412, 431 (S.D.N.Y. 2014) ("'A municipal policy may be pronounced or tacit and reflected in either action or inaction,' but either way Plaintiff must allege it with factual specificity, rather than by bare and conclusory statements." (citation omitted)).

## CONCLUSION[23]

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 27)

---

[23]    If Drew requires copies of any of the cases reported only in Westlaw, he should request copies from opposing counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

32

is <u>DENIED</u> as to Drew's excessive force claim against C.O. Jackson, and otherwise is <u>GRANTED</u>.[24]

The Court will hold a status conference in courtroom 20D, 500 Pearl Street, on September 8, 2016 at 9:30 A.M.  Defense counsel is to arrange with the prison for Mr. Drew to appear telephonically by calling chambers (212-805-0036) at the scheduled time.


SO ORDERED.

Dated:      New York, New York
            August 29, 2016


                                    _____
                                    **Andrew J. Peck**
                                    United States Magistrate Judge



Copies to:    All Counsel (ECF)
              Keith Drew (mail)

---

[24]    Drew's unexhausted claims are dismissed without prejudice.  Although Drew's time for filing a grievance with respect to his remaining claims has passed (<u>see</u> Ex. F: IGRP Directive at 12), the Court cannot conclude as a matter of law that Drew could not exhaust these claims and re-file suit, particularly in the absence of any argument from the defendants in this regard (<u>see generally</u> Dkt. No. 28: Def. Br.).  The IGRP Directive allows for grievance time extensions in certain circumstances, which may or may not benefit Drew.  (IGRP Directive at 14.)